# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **LAURA L. HOUSMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-CV-416-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Laura L. Housman ("Housman"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Housman appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Housman was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Housman was 34 years old at the time of the hearing before the ALJ on April 13, 2009. (R. 22). She had completed two years of college. *Id.* At the hearing, Housman amended the onset date of her disability to July 28, 2007, the date on which she had an episode of cardiac arrest. (R. 23, 25).

Housman testified that she had participated in a methadone treatment program for approximately one to two years for an addiction to Lortab. (R. 25). She testified that in July 2007 she had been hospitalized for approximately a month and a half following a sustained cardiac arrest caused by an overdose of methadone and cocaine. (R. 25-26). She stated that she had not used alcohol or drugs since her hospitalization. (R. 26-27).

As a result of the cardiac arrest Housman suffered, she had 90 percent hearing loss in her left ear and 60 percent hearing loss in her right ear. (R. 31-32). Housman wore a hearing aid in her right ear and learned to look at people when they talked. (R. 32). Background noise occasionally affected her ability to hear. (R. 32). Housman worked as a receptionist at her father's office for one to two hours weekly and used the aid of an amplifier to hear on the phone. (R. 23, 27, 32).

John Easley, Housman's father, testified at the hearing that Housman sustained short-term memory problems subsequent to the July 2007 episode of cardiac arrest. (R. 34). He testified that Housman's mother helped Housman remember things, and helped her complete chores. (R. 34-35). He stated that he employed Housman in order to provide her with additional therapy and social interaction. (R. 38). He said that Housman had to be retrained every day due to her short-term memory problems. (R. 34-38). He had to give her direction daily on tasks such as filing and taking the mail out, because she had difficulty retaining instructions. (R. 35). He stated it took a lot of his time to have Housman work at his office because she needed to be closely supervised. (R. 37-39). He believed Housman's hearing problem interfered with her ability to work in a noisy environment. (R. 36).

Housman resided with her mother and with her two young children during limited weekend visitations that were supervised by her mother. (R. 29-31). Housman stated her mother

helped her take care of her day-to-day chores and activities, helped her care for her children, helped her cook dinner, and went with her to the store. (R. 27-31). Housman was able to independently take care of her personal hygiene, prepare her breakfast and lunch, do her own dishes, do the laundry, watch television, and manage her money. (R. 27-29). She testified that she had no friends, no hobbies, and no outside activities. (R. 28). She had her driver's license and testified that she had no difficulty in hearing emergency vehicles when she drove. (R. 32-33).

On June 12, 2003, Housman presented to the Emergency Room of Saint Francis Hospital ("Saint Francis") subsequent to an auto vehicle accident. (R. 448-61). Housman complained of neck, back, elbow, knee and chest pain. (R. 452, 458). Diagnostic films showed no abnormality. (R. 451-54). Housman was given narcotic pain medication at the hospital. (R. 461). On discharge, she was provided prescriptions for Vicodin and Skelaxin. (R. 456).

Housman returned to Saint Francis on June 30, 2003 for continued neck and back pain. (R. 444). She additionally complained she had throbbing frontal headaches. *Id*. Results of a cranial CT scan showed no abnormality. (R. 440). She was given a shot of Toradol for pain. (R. 438). Records reflect that Housman stated her use of Lortab and Skelaxin provided her gradual pain relief. (R. 444). The doctor diagnosed her with post-concussion syndrome and gave her refill prescriptions for Vicodin and Skelaxin. (R. 442).

Family Medical Care of Tulsa, Inc. ("Family Medical") provided Housman's routine medical care from 2004 through 2006. (R. 216, 240-45). On September 21, 2004, she was treated at Family Medical for neck pain and migraine headaches. (R. 247-48). Housman reported she had injured her neck while moving boxes and had sharp pain that radiated down her back and restricted her ability to move her neck. *Id*. She requested a prescription for

hydrocodone. *Id*. She was treated with prescriptions for Flexeril, Lortab, and ibuprofen. (R. 248).

Housman phoned Family Medical on January 27, 2005 requesting Tylenol #3 for sinus pain and congestion. (R. 246). On January 28, 2005, Housman was diagnosed at Family Medical with a neck strain she sustained when she bumped into her daughter. (R. 276). She reported that she experienced headaches and neck pain. *Id*. The record reflects that Housman requested Lortab when offered Flexeril stating that "Lortab is the only thing that helps." *Id*. The doctor made notation of Housman's "pain med seeking behavior." *Id*. She was treated with prescriptions for Flexeril and Lortab. *Id*.

Housman presented to Saint Francis's emergency room on February 2, 2005 for neck pain that she said was due to moving boxes. (R. 434-38). She was diagnosed with a cervical strain and provided prescriptions for Vicodin, Flexeril, Baclofen, and hydocodone. (R. 435).

Housman reported during her appointment at Family Medical on April 15, 2005 that she was experiencing symptoms of anger, stress, and irritability. (R. 261). Following the birth of her child, Housman was examined at Family Medical on June 7, 2005. (R. 240-41). Housman reported that she was participating in a daily methadone treatment program. (R. 240). She was treated with Lexapro for a depressive disorder, not elsewhere classified. (R. 241).

During Housman's appointment at Family Medical on July 13, 2005, she reported that she had experienced a recent onset of acute anxiety and abdominal pain. (R. 237-39). Housman stated that she had been attending counseling sessions and that her therapist had recommended she see her physician for anxiety medication. (R. 237). Housman reported that she continued to be on a methadone maintenance program. *Id*.

Housman presented to Family Medical on August 2, 2005 for anxiety medication refill.

(R. 234-36).  She reported that she had been continuing with counseling sessions.  (R. 234).

Doctor notes of Housman's October 25, 2005 appointment at Family Medical reflect that

Housman appeared anxious, but was not in any acute distress.  (R. 231-33).

Housman reported that her symptoms of anxiety were well controlled by medication

during her appointment at Family Medical on December 16, 2005.  (R. 228).  Housman stated

she became agitated when she had moments of forgetfulness.  *Id*.  The doctor observed that

Housman did not appear anxious or depressed.  (R. 229).

Housman was treated at Family Medical on March 1, 2006 for increased symptoms of

recurrent anxiety.  (R. 226).  She reported she continued with bi-weekly counseling sessions at

RightWay Clinic.  *Id*.  Housman was seen for a follow-up appointment on March 24, 2006, and

she reported she was doing well on the current dose of Klonopin.  (R. 224).

On April 4, 2006, Housman presented to Saint Francis emergency room with complaints

of neck and chest pain following an automobile accident.  (R. 419-33).  Notes reflect that

Housman did not appear to be in any distress, had slurred speech, and was hard to arouse for

examinations.  (R. 427-30).  The doctor diagnosed her with cervical spine sprain and chest wall

strain/contusion.  (R. 427, 430).  She was given a shot of Toradol for pain.  *Id*.  Housman refused

prescriptions the doctor offered her and instead requested a prescription for hydrocodone.  (R.

427, 430-32).  The doctor informed Housman he was uncomfortable providing her with narcotic

prescriptions, so she left without any prescriptions.  (R. 431-32).

Housman presented to Family Medical on June 26, 2006 for refill of Propranolol for

diagnosed benign essential hypertension, refill of Klonopin, and refill of asthma medications.  (R.

221-22).

Housman was a patient at Peoria Medical clinic for twice weekly chiropractic treatment

from October 3, 2006 to November 20, 2006.  (R. 169-187,  191).  Housman complained of sharp pain in her neck and dull low back pain following a previous auto accident.  (R. 187).

Gary R. Lee, M.D. treated Housman on October 18, 2006 for persistent pain in her cervical and lumbar regions.  (R. 191-93).  Housman stated she had burning low back pain and severe loss of range of motion in her neck.  (R. 191).  Dr. Lee's examination revealed Housman had tenderness and spasms in her neck and back.  (R. 192).  He additionally noted Housman had "exquisite back pain" and loss of range of motion in the cervical and lumbar spine regions.  *Id*.  He prescribed her Lortab and Flexeril for her symptoms.  (R. 193).

Dr. Lee's bi-weekly examinations of Housman in November 2006 showed she continued to be in "substantial pain" and continued to have tenderness in her neck, thoracic spine and lumbar spine.  (R. 195, 197-98, 200-01).  Dr. Lee reviewed Housman's October 19, 2006 lumbar spine MRI and diagnosed a disc protrusion of her L4/L5 level and strain injury to the spine.  (R. 188, 194-95).  The MRI scans additionally showed a cervical disc injury with disc protrusion at C5/C6 that caused a flattening of the cord, and an annular tear at the C6 nerve roots.  (R. 189-90, 197).  Dr. Lee continued prescriptions for Lortab and Flexeril.  (R. 195, 198-99)

During Housman's November 16, 2006 appointment at Family Medical, she reported she had ongoing symptoms of anxiety.  (R. 216-17).  She stated she maintained physical therapy sessions for ongoing back pain problems and was still on a methadone maintenance program.  (R. 216-19).  Housman's demeanor was described as lethargic and slow.  (R. 217).

During Housman's appointment with Dr. Lee on December 13, 2006, she continued to have complaints of neck and low back pain.  (R. 203-05).  His examination found Housman had normal range of motion in her low back.  (R. 204).  Dr. Lee continued Housman's medication and therapy treatment plan.  *Id*.  His plan was to have Housman taper off the use muscle relaxers and

narcotic pain medications over the period of a month and to have her transition to the use of Tylenol and Advil.  *Id.*

Dr. Lee examined Housman on January 24, 2007 for ongoing chronic neck and back pain. (R. 206-08).  *Id.*  Dr. Lee's examination of Housman's neck and back revealed she had normal movement and had no tenderness.  (R. 207).  He refilled Housman's prescriptions for Lortab and Flexeril.  *Id.*

Dr. Lee treated Housman on February 23, 2007 for continued complaints of neck and back pain.  (R. 209-10).  His examination found Housman had an 80% improvement of her symptoms with comparison to her first presentation.  *Id.*  He provided her medication refills for Lortab and Zelnorm.  (R. 210-11).  Dr. Lee assessed that Housman had permanent disability to her cervical and lumbar regions and released her from his care.  (R. 210).

Housman was seen at Family Medical on March 21, 2007 for a medication consult.  (R. 212-13).  Housman stated that she needed refills for asthma and anxiety medications.  (R. 213). Housman reported that she was currently involved in a methadone maintenance program.  *Id.* Housman presented to the emergency room of Saint Francis on June 30, 2007 with complaints she was unable to walk due to severe hip and knee pain following a fall off her bed.  (R. 410-18). Diagnostic films showed no abnormality.  (R. 411-12).  Housman was given a shot of Toradol and discharged with prescriptions for Lortab and Flexeril.  (R. 415, 418).

Emergency personnel were called to Housman's home on July 28, 2007 when she was found without cardiac rhythm.  (R. 291-92).  Housman was resuscitated, intubated, and transported to Saint Francis.  *Id.*  At the hospital, Housman's mother informed the doctors that Housman had a long history of alcohol and illegal drug abuse.  (R. 293).  Her mother additionally reported that Housman was participating in methadone program for her drug addiction.  *Id.*

Housman's boyfriend informed the doctor that he believed Housman had taken double her daily allotment of methadone and that she had recent cocaine use. (R. 291- 92). A drug screen was positive for barbiturates and cocaine. (R. 291-92, 311). Diagnostic testing confirmed that Housman had sustained anoxic brain injury secondary to respiratory arrest from the drug overdose. (R. 288, 298-99).

On August 7, 2007, Housman's doctors found she had neurological improvement because she recognized her family members and she was able to speak some words and to follow simple commands. (R. 289-90). Doctors opined that Housman's neurologic recovery would be slow over a duration of 12 to 18 months. *Id*. It was recommended that she continue to receive aggressive rehabilitation services focused on a full brain recovery. *Id*.

During the course of Housman's hospitalization, she suffered complications including acute renal failure that required dialysis, respiratory failure, probable aspiration pneumonia, systemic inflammatory response syndrome, ischemic liver injury, hypertension, coagulopathy and hyperkalemia. (R. 288-94). Housman was discharged from Saint Francis on August 27, 2007 and transferred to a speciality hospital for continued rehabilitation. (R. 288). Notes show she continued to be on dialysis for acute renal failure. *Id*. After her release, she showed improvement of anoxic brain injury and pancreatitis. (R. 288-90). The remainder of the Housman's multiple medical complications had resolved. *Id*.

The record contains a DDS form titled Physician's/Medical Officer's Statement of Patient's Capability To Manage Benefits dated August 20, 2007 that was apparently completed while Housman was hospitalized at Saint Francis. (R. 286-87). The form indicates that Housman would not be able to manage money because of her episode of cardiac arrest and sustained anoxic encephalopathy. (R. 287).

Shirley O'Dell, Ph.D., RN, saw Housman for weekly counseling sessions over the span of approximately 18 months. (R. 463-76, 527). During Housman's first sessions with Dr. O'Dell in October and November 2007, Housman was living in an in-patient treatment house for her self-reported ten-year history of addiction to Lortab and illegal drugs. (R. 464-74). Housman reported that her children had been taken away from her due to her addiction. *Id.* She told Dr. O'Dell that she was suffering symptoms of depression and she lacked motivation. (R. 465-66). In describing her emotions, Housman told Dr. O'Dell that she had difficulty feeling happy or sad, that she did not get mad or angry, and that she never laughed. (R. 470). Housman told Dr. O'Dell she experienced hearing problems and had problems with her balance. (R. 473-74).

During her first appointment with Housman, Dr. O'Dell found that Housman was well groomed and "very much at ease." (R. 469). During diagnostic testing, Dr. O'Dell described Housman as well oriented, showing no confusion, and having no difficulty with instruction. (R. 469-70). Dr. O'Dell stated that Housman did well on tests that required good judgment and insight. *Id.* She noted that the rate and rhythm of Housman's speech was slow due to her hearing problem. (R. 470). She observed that Housman read lips and could understand spoken words when she could look at a person's face and when a low and strong voice was used. (R. 471). She felt that when Housman could hear properly, she had good understanding, and she had good long-term memory. *Id.* Dr. O'Dell observed that Housman had good balance walking forward and backward on her toes and had strong hand and arm coordination. *Id.* Overall, Dr. O'Dell determined that Housman's only physical restriction was her hearing. *Id.*

At her November 1, 2007 appointment with Dr. O'Dell, Housman reported that she continued with problems with her memory, but she felt better about herself. (R. 468-70). Dr. O'Dell's notes reflect that Housman continued with hearing difficulties, difficulty following

directions, and difficulty in caring for herself. (R. 467). Dr. O'Dell noted that Housman displayed little improvement of her impairments. *Id*. She recommended that Housman have rehabilitation, supervision, and vocational training. *Id*. She additionally recommended that Housman wear hearing aids and receive sign language instruction to better communicate. *Id*. Dr. O'Dell recommended Housman undergo an evaluation for brain damage. (R. 468). Overall, Dr. O'Dell believed that Housman's memory and hearing would improve. (R. 471).

Housman presented to Douglas W. Holte, M.D. on October 16 and October 30, 2007 to establish him as her primary physician and as facilitator concerning her recovery and rehabilitation medical care. (R. 447-49). Dr. Holte described Housman as very pleasant, fully cooperative, and well groomed, although she had a flat affect. (R. 478). Dr. Holte opined that the nature of Housman's flat affect might be dependent on her ability to hear in a conversation, because he found when he spoke slowly to Housman, she responded to some jokes and smiled. *Id*. He determined that the hearing aid in Housman's right ear was not adequate enough for her to hear and that she "struggled" in a conversation. *Id*. Dr. Holte's examination of Housman's left ear did not identify perforation that he stated had been identified previously. *Id*. He noted that Housman's memory had been characterized by family as improving. *Id*. Dr. Holte assessed that Housman had markedly decreased stamina. *Id*.

In a letter dated November 15, 2007, Dr. Holte stated that Housman had not reached maximum medical improvement at that time, but had made "tremendous recovery against all odds." (R. 479). In his letter, Dr. Holte estimated that Housman would have 12-18 months of ongoing physical and occupational limitation. *Id*. He recommended that Housman participate in ongoing physical therapy, occupational therapy, and speech therapy to facilitate her recovery process. *Id*.

The record contains drug screens performed from March 6, 2008 through August 15, 2008 showing that Housman was not using illegal drugs. (R. 529-30).

Otological examination by agency consultant and otologist, Donald Dushay, D.O., on January 15, 2008 revealed that Housman had severe to profound hearing loss in her left ear and severe to moderate hearing loss in her right ear. (R. 481). Though Housman used a hearing aid in her right ear, Dr. Dushay recommended she use bilateral hearing aids to effectively communicate. (R. 482).

Audiologist, Raymond C. Bothell, MA, CCC-A, conducted an examination of Housman on January 29, 2008. (R. 492-94). Bothell stated that Housman's voice was beginning to change to be characteristic of a person who had severe hearing loss. (R. 492). On examination, Bothell assessed that Housman had severe hearing loss bilaterally, with worse loss of hearing in her left ear. *Id.* Bothell viewed Housman's case as urgent due to the emotional strain of her hearing loss. (R. 493). He also recommended that Housman learn sign language when she was emotionally ready. (R. 492).

On November 8, 2008, Dr. O'Dell made a hand-written note that there was no change in Housman's abilities. (R. 468).

On May 12 and May 14, 2009, Housman was seen by Roscoe Burrows, Ph.D., for a neuropsychological evaluation. (R. 547-49). Housman reported that she suffered anxiety in her late twenties and had taken Klonopin for several years for her symptoms, but never underwent counseling or treatment. (R. 547). Housman reported that she had no hobbies or social activities. (R. 544). During the course of the two-day examinations, Dr. Burrows observed that Housman was quiet, had a flat affect, was minimally socially responsive, and showed no real verbal or facial expression of emotion. (R. 547, 549). Dr. Burrows found Housman functioned

independently through her ability to support herself financially, manage her own money, provide her own transportation, and perform her own housekeeping. (R. 544).

Dr. Burrows' diagnostic testing concluded that Housman's intellectual functioning fell within the borderline deficient range and that her memory was in low average range. (R. 547, 549). He found that Housman's intelligence and memory were both affected by poor attention and concentration. (R. 549). He noted that Housman did not acquire information well, but she did a "good job" of retaining information. (R. 548). Housman's visual processing, reasoning, cognitive flexibility, and processing speed were each moderately to severely deficient. (R. 549). He stated that Housman "would have great trouble dealing with new situations that may require judgment, reasoning and quick response." *Id*. He said that it was essential that Housman's father remain her legal guardian. *Id*.

In connection with Housman's disability appeal, Dr. O'Dell provided a Mental Medical Source Statement on April 9, 2009. (R. 525-28). Dr. O'Dell determined that Housman had severe limitations in seven functional categories, including all four categories within the area of adaptation. *Id*. One example of Housman's severe limitation was in her ability to respond appropriately to changes in the work setting. (R. 527). Dr. O'Dell checked boxes indicating marked limitation in twelve functional categories, such as marked limitations in Housman's ability to make simple work related decisions or to ask simple questions or request assistance. (R. 525-27).

Dr. O'Dell included two pages of hand-written comments in her assessment. (R. 527-28). Dr. O'Dell believed that Housman had suffered frontal lobe syndrome, and that due to the injury to her brain, she would potentially never be completely able to care for herself. *Id*. She assessed that Housman's insight and judgment were impaired. (R. 528). Dr. O'Dell recommended that

Housman undergo further testing. (R. 527-28).

On January 18, 2008, Luther Woodcock, M.D., a nonexamining agency consultant, completed Housman's Physical Residual Functional Capacity Assessment. (R. 484-91) Dr. Woodcock assessed that Housman could perform light work. (R. 485). He determined she had no postural, manipulative, or visual limitations. (R. 486-87). He found a limitation in Housman's ability to hear and stated that her environment should avoid areas with high levels of background noise where she could endanger herself or others. (R. 488). He found she would be able to communicate with co-workers and supervisors. *Id.*

Agency consultant Stephanie C. Crall, Ph.D., conducted a psychological evaluation of Housman on April 24, 2008. (R. 495-99). Housman reported that her disability was caused by an accidental overdose in 2007 that resulted in her deafness and short-term memory loss. (R. 495). At the time of her examination, Housman reported that she was not using prescription medications. *Id.* Housman denied that she suffered any current symptoms of anxiety, depression, or psychosis, despite her past difficulty with anxiety and depression. *Id.* Dr. Crall observed that Housman presented with a flat affect, and she was alert, oriented, pleasant, and cooperative. *Id.* She found Housman's speech to be logical, goal-directed, and fully intelligent, but her cognitive processing appeared slow, and she spoke slowly. *Id.* Dr. Crall observed that Housman not did have any difficulties with her posture, gait, or motor behaviors. *Id.* Housman reported she was able to independently perform her typical activities of daily living ("ADLs"), such as her personal hygiene and general housekeeping chores. (R. 496). Dr. Crall stated Housman lived in apparent social isolation. *Id.*

In Dr. Crall's opinion, Housman would have adequate ability to engage in simple work-related mental activities, but she would likely show impairment in her ability to complete

complex tasks. (R. 496). diagnosis was depressive disorder not otherwise specified. (R. 213). On Axis I,[1] Dr. Crall diagnosed Housman with a cognitive disorder, not otherwise specified; cocaine dependency, in early full remission; and opioid dependency. (R. 497). She determined that Housman's condition was not expected to show improvement or change significantly within the next 12 months. *Id*. In Dr. Crall's opinion, Housman was able to manage her own funds. (R. 498-99).

Housman was evaluated by agency consultant Dennis A. Rawlings, Ph.D. on June 23, 2008. (R. 500-04). Dr. Rawlings's evaluation included review of Housman's history and administration of the WMS-III test. (R. 500-01). During the interview, Housman informed Dr. Rawlings that she was not on any medication, she maintained a pleasant mood daily, she maintained good sleep daily, and she had good energy. (R. 501-02). She stated she was able to do household chores, do laundry, cook simple meals, use the microwave, manage her own money, lift 20 pounds, and drive short distances once a week. (R. 502). She reported she was able to watch television and read with good attention, use the computer, and shop independently. *Id*. Housman said she did not get anxious in a crowded store. *Id*. She went to church but had no social friends. *Id*. She reported she got along well with people. *Id*.

Housman's parents accompanied her to the interview with Dr. Rawlings and informed him that Housman's personality had changed considerably subsequent to her drug overdose. (R. 501-02). They said that Housman had previously been outgoing, emotional, and involved, and that she had been a world class figure skater as a child. (R. 502-03). Subsequent to her 2007

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM-IV").

overdose, her parents felt that Housman had become apathetic and lacking motivation. *Id*. They reported that she was never angry and had flat emotions. *Id*. Her father stated that Housman had become passive, and he felt that someone could easily take advantage of her. (R. 503). Her parents stated that Housman had previously functioned at a "much higher level" and that her cognitive level was greatly reduced. (R. 502-03). They reported that Housman spent her time alone either reading or watching television with closed captioning. (R. 503).

Dr. Rawlings' tests concluded that Housman's general memory function was in the low average range. (R. 503). He concluded that Housman's Axis I diagnoses were a personality change due to a general medical condition, and cocaine and opiate overdose, and anoxic encephalopathy; opioid dependence in full sustained remission; and cocaine dependence in full sustained remission. (R. 503). Housman's Global Assessment of Functioning ("GAF")[2] was listed as 55 to 60 currently. *Id*. Dr. Rawlings stated that Housman would have a "fair to guarded" prognosis with continued rehabilitation services and with continued sobriety. *Id*.

Tom Shadid, Ph.D., a non-examining agency consultant completed a Psychiatric Review Technique form with assessed dates from June 15, 2004 through date of his evaluation of Housman on July 29, 2008. (R. 505-18). On the Psychiatric Review Technique form, Dr. Shadid noted that Housman suffered organic mental disorders, as evidenced by memory

---

[2]The GAF score represents Axis V of a Multiaxial Assessment system. DSM-IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

impairment, change in personality, and cognitive disorder, not otherwise specified, for Listing

12.02. (R. 505). Dr. Shadid said that Housman had substance addiction disorder denoted in

Listing 12.09 due to cocaine and opioid dependence in early full remission. (R. 505, 513). For

the "Paragraph B Criteria,"[3] Dr. Shadid found that Housman had mild restriction of her ADLs,

moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining

concentration, persistence, or pace. (R. 515). Dr. Shadid noted that there was insufficient

evidence regarding episodes of decompensation. *Id.*

Dr. Shadid completed a Mental Residual Functional Capacity Assessment dated July 29,

2008. (R. 519-22). He assessed that Housman was markedly limited in her ability to understand,

remember, and carry out detailed instructions, and in her ability to interact appropriately with the

general public. (R. 519-20). Dr. Shadid wrote that Housman could understand, remember, and

carry out simple tasks with routine supervision, relate to supervisors and peers on a superficial

work basis, and adapt to a work situation. (R. 521). She could not relate to the general public.

*Id.*

Psychologist and agency consultant, Larry Vaught, Ph.D. conducted a neuropsychological

evaluation of Housman on July 14, 2009. (R. 534-43). Housman reported her primary claim for

disability was for deafness caused by antibiotics used to treat her during her 2007 hospitalization.

(R. 534). Housman's parents told Dr. Vaught that before Housman's drug overdose she had been

---

[3]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

outgoing and talkative, and afterwards she was quieter and less emotional. (R. 534-35, 538). In response to her parents' statement on a change in her personality, Housman replied that she did not "have anything to be emotional about." (R. 534, 538). Housman reported that she was unaware of any change, other than her complete loss of libido. (R. 534-35, 538). Dr. Vaught said Housman presented with a markedly flat and unvarying affect. (R. 535, 537-38). He noted Housman's speech was intelligent and fluent, though slowed. (R. 535). Housman told Dr. Vaught she was able to drive, cook dinner, do the laundry, and do household chores. (R. 534). Housman stated that she was able to be in public without difficulty. *Id*. She stated her sleep, appetite, memory, and concentration were generally "okay." *Id*.

Dr. Vaught's diagnostic testing concluded that Housman had good auditory memory when given cues and reminders, but had poor visual memory of events. (R. 535). He found Housman was able to recall one of four words after a twenty minute period, but could remember two of the words when given prompts. (R. 535-36). Her performance on the "Trail B" tests showed a marked or severe impairment of her ability for complex attention and concentration. (R. 536, 538). Result of Housman's motor functioning showed she had severe impairment of her manual dexterity bilaterally, and her grip strength was moderately impaired on her left and moderately to severely impaired on her right side. (R. 537, 543). On Axis I, Dr. Vaught diagnosed that Housman suffered personality change due to a general medical condition and cognitive disorder due to a general medical condition. (R. 538).

Dr. Vaught's evaluation included a Mental Medical Source Statement. (R. 540-43). Dr. Vaught assessed that Housman was mildly limited in her ability to understand, remember, and carry out simple instructions. (R. 540). Housman had marked limitation of her ability to understand, remember, and carry out detailed and complex instructions. *Id*. Housman was

mildly limited in her in ability to make judgments on simple work-related decisions; she but had

marked limitation in her ability to make judgments on complex work-related decisions. *Id*.

Housman had marked limitation in her ability to interact appropriately with the general public,

supervisors, and coworkers. (R. 541). She had marked limitation in her ability to respond

appropriately to usual work situations and to changes in routine work setting. *Id*. In support of

his conclusions, Dr. Vaught noted Housman's "extremely flattened affect associated with anoxic

injury" and her performance of severe impairment on the Trail B test. (537-38, 540, 543).

### Procedural History

Housman filed applications on August 21, 2007 seeking disability insurance benefits and

supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*. (R.

92-99). The applications were denied initially and upon reconsideration. (R. 47-55, 57-62). ALJ

Lantz McClain conducted a hearing on April 13, 2009 in Tulsa, Oklahoma. (R. 18-42). On October

22, 2009, the ALJ issued a decision in which he concluded that Housman was not disabled. (R.

7-15). On June 10, 2010, the Appeals Council denied Housman's request for review of the ALJ's

findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for

purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment."

42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental

impairment or impairments are of such severity that he is not only unable to do his previous work

but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security

regulations implement a five-step sequential process to evaluate a disability claim.[4] 20 C.F.R. § 404.1520. *See also Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id*.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id*., *quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin*, 365 F.3d

---

[4]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Housman's date last insured was September 30, 2007. (R. 9). At Step One, the ALJ found that Housman had not engaged in any substantial gainful activity since her alleged onset date of July 28, 2007. *Id.* At Step Two, the ALJ found that Housman had severe impairments of status post-cardiac arrest, status post-respiratory failure, status post-renal failure, anoxic brain injury, bilateral hearing loss, and a cognitive disorder. *Id.* At Step Three, the ALJ found that Housman's impairments did not meet a Listing. (R. 10).

The ALJ determined that Housman had the RFC to do light work with the additional limitations that she could perform simple repetitive tasks with incidental contact with the public that did not require good hearing. (R. 10-11). At Step Four, the ALJ found that Housman was unable to perform any past relevant work. (R. 13). At Step Five, the ALJ found that there were jobs that Housman could perform, taking into account her age, education, work experience, and RFC. (R. 13-14). Therefore, the ALJ found that Housman was not disabled at any time from her alleged onset date of July 28, 2007, through the date of his decision. (R. 14-15).

## Review

Housman raises issues regarding the ALJ's treatment of the opinion evidence, his Step Five analysis, his credibility assessment, and his analysis of Listing 12.02. Because the undersigned finds that the ALJ erred in his consideration of the opinion evidence of agency consultant Larry Vaught, Ph.D., this case must be reversed and remanded for further consideration. Because reversal is required by the issue relating to Dr. Vaught's opinion evidence, the other issues raised by Housman are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more

20

weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). The regulations of the Social Security Administration require that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 416.927(d); *see also* SSR 96-5p, 1996 WL 374183 ("[O]pinions from any medical source about issues reserved to the Comissioner must never be ignored."). An ALJ must consider the opinion evidence and, if he rejects it, he must provide specific legitimate reasons for the rejection. *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished), *citing Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003). If an ALJ's RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion was not adopted. *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished), *citing* SSR 96-8p, 1996 WL 374184; *Ramirez v. Astrue*, 255 Fed. Appx. 327, 332-33 (10th Cir. 2007) (unpublished) (directing ALJ on remand to make specific findings explaining why he did not adopt opinions of consulting examiner).

In the present case, Dr. Vaught was an agency consultant who examined Housman on July 14, 2009, after the hearing before the ALJ on April 13, 2009. His report was detailed, consisting of a six-page narrative and a three-page Medical Source Statement. (R. 534-43). The Medical Source Statement was a form that gave boxes to be checked in two categories: Housman's ability to understand, remember, and carry out instructions, and her ability to interact appropriately at work. (R. 540-41). Of six individual functions in the first category, Dr. Vaught found Housman was mildly impaired for three functions regarding simple instructions, and she was markedly impaired for three functions relating to complex instructions. *Id.* For the second category, four individual functions were listed. (R. 541). Dr. Vaught found that Housman had a marked impairment of all four functions in this category. *Id.* Dr. Vaught's opinions in the two

categories presented by the form were in addition to his narrative report, in which he stated that Housman had a "marked lack of initiative," marked impairment of complex attention and concentration, and "impaired regulation of motor responses." (R. 538).

The sum total of the ALJ's discussion of Dr. Vaught's opinion evidence follows:

> After MMPI-II testing on July 14, 2009, Dr. Vaught stated that the profile was of questionable validity. [Citation omitted.] Dr. Vaught completed a medical source statement indicating that the claimant had marked limitations in her ability to understand, remember, and carry out complex instructions and interact appropriately with the public, supervisors, and coworkers. [Citation omitted.]

(R. 12). This is not an adequate discussion of the quality and quantity of the opinion evidence provided by Dr. Vaught's 10-page report.

> [I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). It is error to ignore evidence that would support a finding of disability while highlighting the evidence that favors a finding of nondisability. *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007). An ALJ is "not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." *Robinson*, 366 F.3d at 1083.

The ALJ only included restrictions of simple repetitive tasks and incidental contact with the public to address all of the evidence that Housman had been left with severe mental impairments following the July 2007 episode of cardiac arrest. (R. 10-11). These two restrictions do not address all of the opinion evidence put forward in Dr. Vaught's report. One example is that the ALJ said that Housman needed incidental contact with the public, when Dr. Vaught had found that she had a marked inability to interact appropriately with supervisors and co-workers, as well as the public. (R. 10-11, 541). While the ALJ included a mention of these

findings in his brief discussion of Dr. Vaught's report, he did not explain why he included no provision in his RFC to address these limitations. A second example is that Dr. Vaught found a marked limitation in Housman's ability to respond appropriately to work situations and changes. (R. 541). The ALJ neither mentioned this aspect of Dr. Vaught's report, and he included no provisions in his RFC that addressed this limitation. He did not explain this omission. As noted above, it was not permissible for the ALJ to ignore these aspects of Dr. Vaught's report, and he was required to explain why he did not adopt all of the opinions of Dr. Vaught in his RFC determination. *Sitsler,* 182 Fed. Appx. at 823; *Ramirez*, 255 Fed. Appx. at 332-33.

Because the ALJ did not fulfill his obligations regarding the consulting opinion evidence of Dr. Vaught by discussing the evidence and by explaining why he did not adopt all of Dr. Vaught's opinions when formulating his RFC, the ALJ's decision will be reversed to give him an opportunity to do so.

Because the errors of the ALJ related to the opinion evidence require reversal, the undersigned does not address the remaining contentions of Housman. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Housman.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 24th day of August, 2011.

Paul J. Cleary
United States Magistrate Judge